Argued February 26; affirmed March 5, 1946

# STATE *v.* KEMANO

(166 P. (2d) 472)

S. L. Staats and W. L. Cooper, both of Portland, for appellant.

J. Raymond Carskadon, Deputy District Attorney, of Portland (with T. B. Handley, District Attorney, and J. Graham Killam, Deputy District Attorney, both of Portland, on the brief), for respondent.

KELLY, J.

Defendant, Everett R. Kemano, having been convicted of the crime of burglary not in a dwelling house, appeals from such judgment of conviction, and submits two assignments of error.

The first of these assignments is stated thus:

"First: The evidence, being highly circumstantial, is insufficient to justify a verdict of guilty beyond a reasonable doubt of the crime charged in the indictment."

The record discloses that defendant formally waived a trial by the court without a jury. This eliminates the necessity of a verdict; and hence we construe the foregoing assignment to mean that the testimony in the case is insufficient to support the judgment of the trial court, or, in other words, that there is no substantial evidence in the case in support of the material allegations of the indictment.

The second assignment is as follows:

"Second: The state failed to prove that the defendant did break and enter the premises, or even enter the premises."

■■ Upon appeal from a judgment of conviction, the appellate court is not warranted in weighing the testimony and determining its effect and value as the trial court or jury is required to do. In determining

whether error was committed by the trial court in failing to recognize the alleged insufficiency of the testimony to justify its judgment, the appellate court may properly go no further than to determine whether there is testimony of a substantial nature which tends to support the judgment of the trial court.

The charging part of the indictment is as follows:

"That said Everett R. Kemano on the 30th day of March, A. D. 1945, in the county of Multnomah and State of Oregon, then and there being did then and there unlawfully and feloniously break and enter, by then and there forcibly breaking an outer window thereof, a certain building situated at 904 North Williams Avenue, in the city of Portland, County of Multnomah, State of Oregon, in which said building there was at said time kept certain personal property, to-wit, certain valuable goods and chattels with intent then and there on the part of him, the said Everett R. Kemano, to then and there unlawfully and feloniously take and steal therein and carry away, said personal property, to-wit, said goods and chattels, contrary to the statutes in such cases made and provided, and against the peace and dignity of the State of Oregon."

■ The first element of the crime charged as alleged in said indictment is a breaking and entering of a building; the second, that there was property kept in said building; and third, that at the time of the breaking and entering, the defendant intended to steal therein. The indictment employs the phraseology of section 23-513, O. C. L. A. Vol. 3, p. 48.

The term "breaking and entering" in this character of a case must be understood in the light of the statutory provision to the effect that every unlawful entry of any building with intent to steal or commit any

felony therein shall be deemed a breaking and entering the same. Section 23-515, O. C. L. A. Vol. 3, p. 49.

Because of the provisions of the section of our statutes, last above cited, and the charge alleged in the indictment; there are really but two elements of the crime under consideration, namely, an unlawful entry of a building with intent to steal therein; and the presence of property in such building at the time of said entry.

In the case at bar there was undisputed evidence that the building mentioned in the indictment contained personal property which could have been the subject of larceny. There was likewise testimony that a window had been opened through which entry could have been made.

Within about 150 feet from said building, defendant was apprehended seated in an automobile about 4:10 o'clock A. M. of the day charged in the indictment as that upon which said crime was committed. Upon then being questioned by the officers, defendant first stated that he had brought a boy friend there in order that the boy might go to his room. Shortly thereafter he changed his explanation by saying that he had brought a man named Bill Overstreet there so that Overstreet could go to Overstreet's girl friend's house. Neither Overstreet nor his purported girl friend appears as a witness. Upon defendant being asked to produce his draft card, it developed that defendant had been given a classification of 4-F which defendant explained was given him because of a previous record in the Oregon State Penitentiary.

In the glove compartment of the automobile there were some Philip Morris cigarettes and some Chelsea cigarettes. There was also a pair of gloves that showed indications of recently having had contact with gaso-

line. The gloves were still damp and by the gasoline cap on his car, there was a smear of gasoline running down across the fender as if gasoline had been put in there recently. In the trunk of defendant's automobile were some five-gallon cans.

While defendant was in charge of the officers, who had arrested him upon ascertaining the foregoing facts concerning him and the articles in his car, one of the officers caused defendant to remove his trousers; and, out of the cuffs thereon, brushed some steel and iron filings, which were taken to Dr. Joseph Beeman, Director of the Crime Detection Laboratory of the State Police for the State of Oregon.

Upon one of the five-gallon cans taken from the trunk of defendant's automobile were splashes or spots of red paint. This can was taken by the officers and became an exhibit in the case.

The testimony disclosed that in the building in suit, there was a repair shop and a gasoline filling pump. In the repair shop a workman had spilled some red paint upon the floor and also upon portions of a five-gallon can that was upon the floor. This workman identified the can taken from defendant's car as being the can upon which he had spilled the red paint. Actual size pictures were taken of the floor and the can was placed thereon and the paint upon the can fitted and matched the paint on the floor. The lock on the gasoline filling pump was broken and eighteen gallons of gasoline were gone.

In the manager's office there was a desk in the drawer of which there were Philip Morris cigarettes and Chelsea cigarettes. This desk had been ransacked and the cigarettes were taken.

An attempt had been made to break open the safe in the building, the dial to the combination lock was knocked off and holes were bored by an electric drill in the front of the safe. This safe had been painted with dark olive-drab green paint. Filings or drillings from the safe were upon the floor near the safe and these were gathered up and taken to Dr. Joseph Beeman.

We quote from Dr. Beeman's testimony:

"Q  Would you be in position at this time to tell the court just what you did with these filings?

A  Yes, sir.

Q  Go ahead, and, in your own words, explain what you did.

A  The two envelopes, labeled right and left pant cuff, contained a mixture of dirt, steel filings and small fragments of brass and some dark, olive-drab green paint. These were separated and a comparison was made with steel filings and what appeared to be a green paint which was from the envelope labeled Material on the floor in front of the safe.

Q  That's at 904 Williams?

A  Yes, sir—Standard Brands Company. Examination was made by means of a spectographic analysis, which is a method of determining what metals and what concentration of metals are present in samples, by means of a photographic and electrolytic process. In this instance, it was for comparison of the two. We didn't care what was in the samples, but we wanted to determine whether they were identical or not.

Q  What was your finding as to the samples taken from the three different envelopes?

A  That the steel filings or iron filings taken from the cuffs were identical with the filings scraped from the floor in front of the safe at the plant of Standard Brands, and that this green,

olive-drab paint taken from the cuffs was identical with the particles of paint found in the scrapings taken from the floor in front of the safe.

Q Then you are positive that the metal and paint in the three different envelopes were identical?

A Yes, sir.''

■ If Dr. Beeman's testimony is to be believed the person who wore the trousers in question when the drilling of that safe was attempted certainly had entered the building with intent to steal. There is nothing in the record disputing the fact that those trousers were then being worn by the defendant. Clearly there was substantial testimony supporting the charge that the defendant effected an unlawful entry of the building in suit with intent to steal therein and that such building was not a dwelling house.

Such unlawful entry under the statute above cited constituted a breaking and entering of the building in question.

Upon oral argument, counsel for defendant contended that the record discloses testimony by an expert in the use of electric drills to the effect that it would be impossible for drillings or filings from such a drill, while being used upon the safe in suit, to fall into the cuffs upon the trouser legs of the operator.

The only expert witness on that subject, who testified, was called by defendant. He is Mr. Axel Kildahl. His testimony in the respect mentioned is as follows:

Direct Examination:

''Q Mr. Kildahl, you have had considerable experience in operating electric drills, have you not?

A A number of years.

Q You have done that kind of work many years?

A Yes.

Q There has been testimony here to the effect that these holes were drilled in a safe approximately sixteen inches from the floor. Would you come down here and demonstrate to the court in just what position a man would have to be in order to drill a hole through a safe sixteen inches from the floor.

* * * * (Objection overruled.) * * * *

Q Come down here where the court may see you. There has been testimony here to the effect that here (indicating) is the safe. Have you been in the courtroom?

A No.

Q The safe sits on the floor. There has been testimony to the effect that the first hole is approximately sixteen inches, we will say—some said twelve and some fourteen and some sixteen from the floor. That would be sixteen inches up from the floor approximately. Can you show the court—demonstrate to the court—in order to get steel shavings in the cuffs of your trousers, what position you would have to be in?

A The drill—the tip of the drill to the handle would be approximately a foot long—ten to twelve inches. You would probably stand in a position like this—in that approximate angle.

Q Your closest foot to the bottom of that safe would be about how far—eighteen inches from the bottom of the safe.

A Yes approximately."

Cross-examination:

"Q Now since on direct examination you gave us a demonstration of how a drill would be used by getting to this position here—getting down like this, and so forth, I notice you had your left foot considerably forward. How far would you say a drill of that kind would throw chips out of it? That's a picture of the drill there at the scene of the crime (showing witness picture).

A I suppose that would depend on the size drill and the nature of the metal.

Q And the speed it revolved?

A Hard metal would come out in a short [sort] of shaving and evidently drop down. If it took much of a cut the larger shavings would be thrown out.

Q I notice you had the down-hill motion on this. In using a drill of this kind, it would be very probable that chips would drop out into your cuffs?

A If you stand close enough.

Q From the demonstration, wouldn't it be logical to say that you would get more shavings in your left cuff than in your right?

A He might have had his right leg forward.

Q You know him pretty well—is he right or left-handed?

A I don't know that.''

While defendant's contention, that it is impossible for drillings or filings to fall into the trouser cuffs of the operator from a drill being operated as the one was operated upon the safe in suit, is evidently based upon the statement of witness Kildahl that in the operation, such as he demonstrated, the operator's foot closest to the bottom of the safe would be eighteen inches from it, it is to be noted that the witness Kildahl did not in any of his testimony state that such a distance between the trouser cuff and the safe would necessarily prevent the entry of the filings or drillings into the cuff. The trial judge may well have considered the purport of Mr. Kildahl's testimony to be that some of such filings or drillings would fall therein.

No error has been shown to have been committed by the learned trial judge; and the judgment of the circuit court is therefore affirmed.